UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| **RENAT T.,** | Civil Action No.  20-4658 (MCA) |
| Petitioner, | |
| v. | MEMORANDUM OPINION |
| **H.O. THOMAS DECKER, et al.,** | |
| Respondents. | |

**ARLEO,** U<span>NITED</span> S<span>TATES</span> D<span>ISTRICT</span> J<span>UDGE</span>

Petitioner Renat T. ("Petitioner" or "Renat T.") is a native and citizen of Kazakhstan, who is currently in the custody of the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), and detained at Bergen County Jail ("Bergen County Jail" or the "Facility") in New Jersey.  On March 29, 2020, Petitioner filed a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2241.  The matter was originally filed in the United States District Court for the Southern District of New York and was transferred to this District on April 14, 2020.  ECF No. 30.  Pursuant to Standing Order 2020-10, the Clerk of the Court severed the multi-petitioner habeas petition, *see* ECF No. 32, and Petitioner's case was assigned to the undersigned on April 21, 2020.  On April 25, 2020, Petitioner filed an Amended Petition and TRO application seeking his immediate release from detention based on his medical conditions that render him vulnerable to severe illness or death if he were to contract the novel coronavirus disease 2019 ("COVID-19").  *See* ECF Nos. 37-38. Respondents oppose the Motion.  *See* ECF No. 40. Having reviewed the parties' submissions, examined the applicable law, and directed Petitioner to supplement the record, the Court now grants the Petition insofar as it seeks a Preliminary

1

Injunction requiring Petitioner's release, and orders Respondents to immediately release Petitioner subject to conditions set forth in the accompanying Order.

## I.     FACTUAL BACKGROUND

### a. Petitioner's Immigration History

Petitioner is a native and citizen of Kazakhstan.  *See* ECF No. 40-6, IJ Decision Denying Bond at 1.  He entered the United States lawfully as a visitor on or about February 7, 2018 and timely filed an application for asylum with U.S. Citizenship and Immigration Service ("USCIS"). Amended Pet. at ¶ 2.  He was detained by ICE pursuant to 8 U.S.C. § 1226(a) on April 11, 2019, and, on June 19, 2019, the Immigration Judge ("IJ") denied his request for bond, finding him to be a flight risk based on an INTERPOL Red Notice issued by his native Kazakhstan and his limited ties to the United States.  *See* IJ Decision denying bond at 2-3.[1]  The Immigration Judge found that Petitioner met his burden to show that he is not a danger to persons or property.  *See id.* at 2.

On September 27, 2019, the IJ denied Petitioner's applications for relief and ordered him removed to Kazakhstan.  Amended Petition ¶ 3.  On March 13, 2020, the BIA denied his appeal of the Immigration Judge's order of removal.  *Id.*  Petitioner filed a petition for review of the BIA's decision with the United States Court of Appeals for the Second Circuit on April 2, 2020.  *Id.*  The parties agree that Petitioner's order of removal is administratively final as of March 13, 2020, and his detention is government by 8 U.S.C. § 1231.  ECF No. 41, Petitioner's Reply at 5; ECF No. 40, Answer at 7.

### b. The COVID-19 Health Crisis

On March 11, 2020, the World Health Organization classified COVID-19 as a global pandemic, anticipating that "the number of cases, the number of deaths, and the number of affected

---

[1] Petitioner appealed the denial of bond, and the Board of Immigration Appeals ("BIA") affirmed the IJ's determination on December 4, 2019.  *See* ECF No. 40-7, BIA Decision dated 12/4/19.

countries" would increase.[2]  Around that time, the United States had reported only approximately 1,000 cases of COVID-19.[3]  As of July 7, 2020, that number has risen to over 3 million and the virus has taken 131,134 lives nationally.[4]  New Jersey alone has reported a total of 175,734 cases and 15,281 deaths as of July 7, 2020.[5]  Bergen County, where Petitioner is detained, currently has the highest number of COVID-19 cases in the state, with 19,937 case and 2009 deaths as of July 7, 2020.[6]

According to the Centers for Disease Control and Prevention (the "CDC"), COVID-19 spreads "mainly from person-to-person" between those "who are in close contact with one another (within about 6 feet)" and possibly when people touch contaminated surfaces and then touch their mouths, noses, or eyes.[7] Common symptoms of COVID-19 include fever, cough, and shortness of breath.[8]

Experts still have much to learn about how the virus spreads.  In early April, the CDC director, Dr. Robert Redfield, in an interview with National Public Radio affiliate WABE, stated that "a significant number of individuals that are infected actually remain asymptomatic.  That may be as many as 25 percent[,]" and this is important because asymptomatic individuals

---

[2] World Health Org., *WHO Director-General's Opening Remarks at the Media Briefing on COVID-19 – March 2020* (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[3] *Coronavirus Case Total Climbs in New York*, THE NEW YORK TIMES (Mar. 11, 2020) https://www.nytimes.com/2020/03/11/nyregion/coronavirus-new-york-update.html.

[4] *Coronavirus in the U.S.: Latest Map and Case Count,* THE NEW YORK TIMES, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html, (last visited Jul. 7, 2020).

[5] *New Jersey Coronavirus Map and Case Count*, THE NEW YORK TIMES, https://www.nytimes.com/interactive/2020/us/new-jersey-coronavirus-cases.html, (last visited Jul. 7, 2020).

[6] *Id.*, https://www.nytimes.com/interactive/2020/us/new-jersey-coronavirus-cases.html#county (last visited Jul. 7, 2020.

[7] Ctrs. for Disease Control and Prevention, *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited Jun. 17, 2020).

[8] *Id.*; Ctrs. for Disease Control and Prevention, *Symptoms of Coronavirus*, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last visited Jun. 17, 2020).

contribute to the transmission of the virus.[9] Furthermore, those who become symptomatic can likely transmit the virus up to 48 hours before they show symptoms.[10] These asymptomatic transmitters and individuals who are transmitting the virus before they become symptomatic help explain how rapidly the virus can spread.[11]

Symptoms of COVID-19 can be mild, and "[a]nyone can have mild to severe symptoms."[12] As explained by the CDC, "[s]ome people are more likely than others to become severely ill, which means that they may require hospitalization, intensive care, or a ventilator to help them breathe, or they may even die."[13] Among them are persons who are those over the age of 65 and people of any age with certain underlying health conditions such as serious heart conditions, diabetes, chronic kidney disease, chronic obstructive pulmonary disease, obesity, and moderate to severe asthma ("CDC Risk Factors").[14] The CDC now advises that certain populations may also be at higher risk of contracting COVID-19 or developing severe symptoms, including those in long-

---

[9] *CDC Director On Models For The Months To Come: 'This Virus Is Going To Be With Us'*, NPR, https://www.npr.org/sections/health-shots/2020/03/31/824155179/cdc-director-on-models-for-the-months-to-come-this-virus-is-going-to-be-with-us; *see also* Apoora Mandavilli, Infected but Feeling Fine: The Unwitting Corona-virus Spreaders, N.Y. Times (Mar. 31, 2020), https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-transmission.html.

[10] *Id.*

[11] *Id.* The CDC also states in its guidance that "COVID-19 may be spread by people who are not showing symptoms." Ctrs. for Disease Control and Prevention, *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited Jun. 17, 2020).

[12] Ctrs. For Disease Control and Prevention, *Symptoms of Coronavirus*, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last visited Jun. 17, 2020).

[13] Ctrs. for Disease Control and Prevention, *People Who Are at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited Jun. 26, 2020).

[14] On June 25, 2020, the CDC updated its guidance to include additional medical risk factors, reflecting available data as of May 29, 2020. Ctrs. For Disease Control and Prevention, *People of Any Age with Underlying Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last visited June 26, 2020).

term care facilities, those with disabilities or behavioral disorders, members of racial or ethnic minority groups, pregnant women, and those who are homeless.[15]

There is presently no vaccine to prevent COVID-19 infections.[16] The CDC and health experts thus emphasize the importance of "social distancing" (i.e. staying at least six feet apart), regularly disinfecting "high touch" surfaces, and wearing cloth face covering to curtail the spread of the virus.[17] Ultimately, "[t]he best way to prevent illness is to avoid being exposed to this virus."[18]

But in truth, avoiding exposure to COVID-19 is impossible for most detainees and inmates in correctional facilities, and detainees who meet the CDC's criteria for "higher risk" are the most vulnerable to a detention facility's shortcomings. In its guidance for correctional facilities, the CDC has explained that, among other things, the crowded and fluid nature of detention facilities, the inadequate hygienic supplies, and the limited options for medical isolation present "unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors." *See* ECF No. 40-1, CDC March 2020 Interim Guidance ("CDC Interim Guidance") at 2. Consequently, practicing social distancing and ensuring proper hygiene to minimize the risk of infection are exceedingly difficult, and the CDC Interim Guidance recommends extensive testing, cleaning and quarantining procedures to contain the spread of infection. *Id.*

---

[15] Ctrs. for Disease Control and Prevention, *People Who Need to Take Extra Precautions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html (last visited June 26, 2020).

[16] Ctrs. for Disease Control and Prevention, *Prevent Getting Sick*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/index.html (last visited June 25, 2020).

[17] Ctrs. for Disease Control and Prevention, *supra* note 12.

[18] *Id.*

### c. Petitioner's Medical Conditions & Experiences at Bergen County Jail

Against this backdrop, Petitioner asserts that he has chronic medical conditions that increase his risk of serious complications or even death if he were to contract COVID-19 and that the measures taken by HCCF are insufficient to protect him from harm. *See* ECF No. 38, Motion for Preliminary Injunction ("PI Motion") at 3. Petitioner asserts that he "presents at least two pre-existing conditions, chronic lung disease and immunodeficiency" and that his "chronic kidney disease is a comorbidity that may elevate his risk of serious illness." ECF No. 37, Am. Petition ¶¶ 4; 36-37. As proof of his medical conditions, Petitioner initially provided a Statement of Health dated March 25, 2020, which is written in his native Russian, and bears several stamps but no signature in the signature block. *See* ECF No. 41, Statement of Health dated 3/25/2020 at 4-6. The "Statement of Health" is translated into English by Elena Grigoryevna Zobnevaas, and this individual's signature has been notarized and sealed by a notary public of the city of Almaty, Kazakhstan. *See id.*

Because the Court could not determine who prepared the Statement of Health and the relationship of the preparer to Petitioner, the Court requested additional information, and Petitioner wife submitted a declaration clarifying that the Statement of Health was prepared Petitioner's longtime physician, Dr. Nurgul Kosmuratova, in Kazakhstan. ECF No. 46-1, Declaration of Gaukhar Makanova ("Makanova Decl.") ¶ 2. Petitioner's wife further clarifies that Petitioner does not have a treating physician in the United States and therefore does not have medical records from the United States other than those generated at the prison where he is detained.[19] *Id.* ¶ 3.

---

[19] Petitioner's wife also explains that she obtained the Statement of Health by reaching out to her sister-in-law, who contacted Dr. Kosmuratova and obtained a statement from her, and Petitioner's wife provided the Statement to Petitioner's attorney. *Id.* ¶ 3.

Dr. Kosmuratova has also provided a supplemental Statement of Health, dated June 29, 2020, stating that she was Petitioner's treating physician from 2005 until 2017, *see* ECF No. 46 at 1, Supplemental Statement of Health.  The Supplemental Statement provides more detail about Petitioner's history of and treatment for numerous chronic medical conditions, including: chronic cholecystitis, polyposis of the gall bladder, chronic gastritis, chronic cholestatic hepatitis, chronic neuromuscular syndrome, chronic pyelonephritis, vegeto vascular dystonia, and osteochondrosis in 2005; exacerbation of chronic prostatitis, varicocell on the left side, discirculatory encephalopathy, iron deficiency anaemia, and secondary immunodeficiency during the period from 2012-2016; and, most recently, acute bronchitis, exacerbation of chronic pyelonephritis, and exacerbation of gastritis, for which he was hospitalized in 2017.  *See id.*  Petitioner's physician also notes that Petitioner was born very prematurely at 28 weeks gestation and suffered from bronchopulmonary dysplasia and congenital intracranial hypertension since his childhood; he also suffered from a lack of sensory and motor abilities and had frequent acute respiratory viral infection and bronchitis (3-4 times per year), due to reduced immunity until he was a teenager.  *Id.*  Petitioner's physician opines that his chronic medical conditions and low immunity place him at risk of severe complications were he to contract COVID-19.  *See id.* at 2.

With respect to the conditions at Bergen County Jail, Petitioner reports to his attorney (via his wife) that he "is suffering from lower back pain due to his kidney disease" and  "requested medical attention but was told that [Bergen County Jail] does not have enough medical staff and therefore he cannot receive medical treatment[.]"  ECF No. 41-2, Fankbonner Decl. ¶ 52.  He further reports that there is no hand sanitizer available at the facility and that personnel wear masks but the facility does not provide masks to inmates.  *Id.*

### d. COVID-19 Response at the Bergen County Jail

The measures to address COVID-19 at the Bergen County Jail are described in detail in the June 30, 2020 Declaration of Warden Ahrendt ("Ahrendt Decl."), s*ee* ECF No. 47-2, and include procedures for mitigating the risk of COVID-19 exposure from both external and internal sources.

To mitigate the risk of exposure from external sources, the Facility suspended all ICE detainee intakes on or about March 13, 2020; as of June 10, 2020, however, the Bergen County Jail began accepting new ICE detainees, but the detainees are tested for COVID-19 upon arrival at the Facility and are housed with other new arrivals in the medical unit until their test results are returned. *See* Ahrendt Decl. ¶ 9.A. If the results are negative, the detainee is reassigned to other housing units depending on their classification. *Id.* When someone tests positive for COVID-19, that individual shall be housed in a quarantine unit, and if a positive detainee came in as part of a group, the entire group shall be quarantined for 14 days, regardless of their test result. *Id.* The Facility is also screening new county inmates, staff members, and vendors for the coronavirus, *id.* ¶¶ 9.B., 9.D, and has also suspended all social visitations and tours, and only "no-contact" visits and telephone conferences are permitted with attorneys. *Id.* ¶ 9.C.

Detainees are housed separately from inmates, and the cells in the housing units are approximately 10' x 7', with two beds per cell that are organized in a bunk-bed style. *Id.* ¶¶ 5-6. There are no more than two detainees per cell. *Id.* ¶ 6. All detainees must remain in their cells at all times, "except for a thirty-minute period each day when they are permitted to exit the cell area." *Id.* ¶ 9.F. During the 30-minute period, "six inmates/detainees are permitted to leave the cell area" where they have "2643 square feet of space" for recreational use and showering. *Id.* Detainees and inmates have meals inside their cells to avoid congregating. *Id.* ¶ 9.L.

The protocol requires that "[a]ll housing units are sanitized no less than four times per day."[20] *Id.* In addition, "[t]he Facility provides disinfectant spray, hand sanitizer, and soap in every housing unit," *id.*, but it is not clear whether these supplies are provided directly to detainees. *Id.* In addition, "[i]nmates and detainees have been issued surgical masks, and all inmates and detainees wear their issued masks any time that they are out of their cells." *Id.* ¶ 9.N. Similarly, staff at the facility have been provided with masks to wear in the facility. *Id.* ¶ 9.E.

The Facility also has isolation and quarantine protocols for confirmed and suspected cases of COVID-19. Confirmed cases that do not require hospitalization are isolated in a designated area. *Id.* ¶ 9.H. Symptomatic inmates or detainees who are awaiting test results are quarantined. *Id.* Finally, those who are asymptomatic but "have had a known exposure" to a confirmed COVID-19 case are "cohorted" together with restrictive movement for fourteen-day period. *Id.* ¶ 9.J. Cohorting ends if no new COVID-19 case develops within that period. *Id.*

The Facility has an on-site physician who is on-call 24/7 for emergencies and has added additional medical staff. *Id.* ¶ 7. Detainees and inmates are permitted to make daily sick calls to on-site medical staff. *Id.* ¶ 9.H. The protocol states that medical staff should evaluate detainees or inmates who complain of illness. *Id.* Those who present with COVID-19 symptoms are provided a "surgical mask." *See id.* Detainees and inmates may be transported to a hospital for evaluation at the direction of the medical director. *See id.* Warden Ahrendt does not state whether high-risk detainees like Petitioner are subject to those same procedures, or whether the Facility makes other accommodations based on their needs.

---

[20] The Office of the Bergen County Sheriff also bought three electric and one gas- powered fogger to increase disinfectant capacity throughout the agency, and these foggers are being used to sanitize units in the jail and patrol vehicles after each shift. *Id.* ¶ 9.O.

9

As of June 30, 2020, two ICE detainees and one Bergen County Inmate at the Facility have tested positive for COVID-19. *Id.* ¶ 9.P. There are no ICE detainees and one inmate suspected cases of COVID-19 in the Facility who are on medical observation per CDC guidelines. *See id.* Twenty-seven County Corrections Police Officers and five Nurses who work at the Facility have tested positive for COVID-19. *Id.* Twenty-five County Corrections Police Officers and five Nurses have returned to duty, and the remaining officers and nurse are in isolation and are not working at the Facility currently. *Id.*

## II. STANDARD OF REVIEW

Under 28 U.S.C. § 2241, a district court may exercise jurisdiction over a habeas petition when the petitioner is in custody and alleges that his custody violates the constitution, laws, or treaties of the United States.  28 U.S.C. § 2241(c); *Maleng v. Cook*, 490 U.S. 488, 490 (1989). A petitioner may seek Section 2241 relief only in the district in which he is in custody.  *United States v. Figueroa*, 349 F. App'x 727, 730 (3d Cir. 2009).  This Court has jurisdiction over Petitioner's claims as he is detained within this district and alleges that his continued detention violates the Due Process Clause of the Fifth Amendment.

Here, Petitioner has filed a motion for a TRO seeking his immediate release from detention, which the Court construes as a request for a preliminary injunction. *See Hope v. Warden York County Prison*, 2020 WL 1922372, at *2-4 (3d Cir. Apr. 21, 2020).  Motions for temporary and preliminary injunctive relief are governed by a four-factor test.  The movant must, as a threshold matter, establish the two "most critical" factors: likelihood of success on the merits and irreparable harm.  *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017).  If these "gateway factors" are satisfied, the Court considers the third and fourth factors, which aim to balance the equities by examining the potential for harm to others if relief is granted and whether the public interest favors

injunctive relief. *Id.* at 176, 179. The Court must then balance all four factors to determine, in its discretion, whether the circumstances warrant injunctive relief. *Id.* at 179.

The Court also considers whether Petitioner has established extraordinary circumstances justifying his release. *See Lucas v. Hadden*, 790 F.2d 365 (3d Cir. 1986); *Landin v. Rafferty*, 970 F.2d 1230, 1239 (3d Cir. 1992) (indicating that a court may only grant release pending a disposition of federal habeas claims when the petitioner has raised "substantial constitutional claims upon which he has a high probability of success, and . . . when extraordinary or exceptional circumstances exist which make the grant of bail necessary to make the habeas remedy effective") (citation omitted)); *see also In re Soule's*, 688 F. App'x 134, 135-36 (3d Cir. 2017).

### III. DISCUSSION

Petitioner asserts that continuing to detain him at Bergen County Jail poses a serious threat to his health and safety because he has chronic medical conditions that make him vulnerable to complications or death should he contract COVID-19. In the Answer, the Government argues that Petitioner fails to substantiate that he has underlying medical conditions that render him more vulnerable to complications if he were to contract COVID-19 and also argues that the protocols in effect at Bergen County Jail are sufficient to protect medically vulnerable prisoners, including Petitioner; for these reasons, the Government maintains that his request for release should be denied. *See* Answer at 17-18.

Courts in this district and in neighboring districts have, in the last two months, released ICE detainees who are similarly situated to Petitioner, including several decisions from this Court releasing medically vulnerable petitioners at Bergen County Jail. *See, e.g., Cristian A.R. v. Decker*, No. 20-3600, ECF No. 26 (D.N.J. April 12, 2020)(finding that the protocols in place at Bergen and Hudson County Jails did not adequately protect medically vulnerable detainees and holding that

11

continued detention such detainees during COVID-19 pandemic amounted to punishment under the Fifth Amendment); *Asmed B. v. Decker*, No. 20-3734, 2020 WL 2539351 (D.N.J. May 19, 2020) (finding that continued detention of medically vulnerable detainee at Bergen County Jail amounted to punishment and ordering detainee released); *Anthony O. v. Decker*, No. 20-3856, 2020 WL 2571897, at *1 (D.N.J. May 20, 2020) (same); *see also Rafael L.O. v. Tsoukaris*, No. 20-3481, ECF No. 25 (D.N.J. April 9, 2020); *Thakker v. Doll*, No. 20-480, 2020 WL 1671563 (M.D. Pa. Mar. 31, 2020); *Jeferson V. G. v. Decker*, No. 20-3644, 2020 WL 1873018 (D.N.J. Apr. 15, 2020); *Marvin A. G. v. Decker*, No. 20-1689 (D.N.J. Apr. 14, 2020); *Kevin M.A. v. Decker*, No. 20-4593, 2020 WL 2092791, at *10 (D.N.J. May 1, 2020).

With respect to Petitioner's medical conditions, the Government notes that Petitioner did not refile the supporting documents that he filed with the multi-petitioner action in the Southern District of New York; the Government therefore contends that it lacked notice of these documents. *See* ECF No. 42. The Government also argues that the Court should "give no weight" to the Statement of Health Petitioner submitted in his Reply because it is not clear what type of medical professional prepared the Statement and where it was prepared. Petitioner, however, has since clarified that his longtime physician prepared the Statement, and his physician has provided more detailed information about Petitioner's history of chronic medical conditions and opined that these conditions and his reduced immunity puts him at risk of severe complications if he were to contract COVID-19. *See* Supplemental Statement of Health. The Court is satisfied that Petitioner has provided sufficient evidence that he has chronic medical conditions that increase his risk of complications or death if he were to contract COVID-19.[21]

---

[21] The Court notes that Respondents argue that Petitioner's medical records do not show that he was treated for these chronic conditions at the jail, and they contend that the lack of treatment means he no longer has these conditions. The Court declines to make that finding on this record, particularly given that Petitioner asserts that he recently

12

Petitioner here, like the Petitioners in *Cristian A.R.*, *Asmed B.* and *Anthony O.*, has provided evidence that he has serious underlying medical conditions that render him more vulnerable to complications or death if he were to contract COVID-19, and the existing protocols at Bergen County Jail, which are largely unmodified from those the Court considered in those cases, are insufficient to protect Petitioner from contracting COVID-19 and therefore amount to punishment under the Fifth Amendment.

Given the heightened risk of COVID-19 exposure, the CDC Guidelines have made clear that correctional facilities must make "all possible accommodations" to prevent transmission of infection to high-risk individuals. CDC Interim Guidance at 16, 20. But despite the laudable, general protocols implemented generally at Bergen County Jail, Warden Ahrendt does not point to any specific protocols to protect medically-vulnerable people in the Facility's custody. Nor do Respondents contest the lack of available testing, and Warden Ahrendt's Declaration does not indicate that the Facility has sufficient testing supplies. Additionally, he confirms that they are not testing asymptomatic individuals (other than new detainees), even though those individuals can transmit the virus. *See* Ahrendt Decl. ¶¶ 9.H. & 9.J. And, while he concedes to cohorting those who have had a known exposure to the virus, he does not indicate whether high-risk individuals like Petitioner would be ensured separation or adequate space from others in the cohorting environment. Although Respondents emphasize that there have been only two confirmed positive cases of COVID-19 at Bergen County Jail and few suspected positive cases among inmates and detainees, its stance on testing prevents the Court from determining whether the dearth of new positive cases is due to the sheer lack of testing or successful containment measures. Thus, to the

---

complained of back pain and was informed that there are not enough medical staff to provide treatment for his back pain.

13

extent Respondents have taken measures to address the pandemic within Bergen County Jail, they have not ensured protection for the most vulnerable people within their care.

As noted above, Warden Ahrendt's June 30, 2020 Declaration also states that detainees have now been provided a surgical mask to wear when outside their cells and clarifies that cleaning supplies have been made available to detainees to sanitize shared spaces and items; he further reports that there are no shortages in cleaning supplies at the Facility. *See* Ahrendt Decl. at ¶¶ 9.N; 9.L. These improvements to the protocol, while laudable, together with assurances about the availability of cleaning supplies do not change the Court's determination that the Facility does not sufficiently protect the most medically vulnerable detainees in their care.

In this regard, the Court notes that Petitioner reports that he has been locked in his cell for 23 hours a day due to the COVID-19 outbreak at the jail and there is no hand sanitizer available at the facility, and masks were not provided to detainees.[22] Petitioner also reports that he has requested medical attention for lower back pain due to his kidney disease but was told that Bergen County Jail does not have enough medical staff and therefore he cannot receive medical treatment.

Because Petitioner's conditions of confinement are not meaningfully distinguishable from the petitioners' circumstances in *Cristian A.R.*, *Asmed B.,* and *Anthony O.*, the Court finds that Petitioner has shown a likelihood of success on the merits of his claim that his detention amounts to punishment in light of his particular vulnerabilities.[23]

---

[22] During the pendency of this action, the Facility changed its protocol and began providing a mask to each detainee to wear outside his/her cell.

[23] Civil detainees also have a constitutional right to adequate medical care, including the creation of policies ensuring adequate health care, and such claims are governed by the deliberate indifference standard. *See Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 585 (3d Cir. 2003) (holding that a reasonable jury could conclude that a governmental entity's failure to establish a policy to address inmates' immediate medication needs constituted deliberate indifference); *A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Detention Ctr.*, 372 F.3d 572, 585 (3d Cir. 2004) (detention center's lack of policies to address the physical and mental health needs of residents caused the plaintiff harm). Because the Court finds that Petitioner is likely to succeed on his claim that his conditions of confinement

To be entitled to a preliminary injunction, a movant must also establish that he or she is "more likely than not" to suffer irreparable harm absent the requested relief. *See Reilly*, 858 F.3d at 179. The Court rejects Respondents' argument Petitioner's likelihood of contracting COVID-19 is speculative. As the Supreme Court observed in *Helling*, "it would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them." 509 U.S. at 33 (noting that "the Courts of Appeals have plainly recognized that a remedy for unsafe conditions need not await a tragic event").

That brings the Court to the balancing of the equities and the public interest. "Before granting an injunction, a district court must balance the relative harm to the parties, i.e., the potential injury to the plaintiff if an injunction does not issue versus the potential injury to the defendant if the injunction is issued." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co*., 290 F.3d 578, 596 (3d Cir. 2002) (internal citation omitted). In *Cristian A.R.*, the Court found the potential of injury to petitioners to be high and also found that the public interest supported the release of Petitioners before they contract COVID-19 to preserve critical medical resources and prevent further stress on the states' and country's already overburdened healthcare systems. *See* 2020 WL 2092616, at *13 (citing *Rafael L.O.*, 2020 WL 1808843, at *9). The same is true here, albeit to a lesser extent, as hospitalizations in New Jersey have declined in the two months since the Court issued its decision in *Cristian A.R.*[24]

---

amount to punishment and because deliberate indifference has a more stringent *mens rea* requirement, it need not reach the deliberate indifference claim.

[24]*See N.J. coronavirus deaths increase to 11,970 with 162,530 total cases. Hospitalizations fall below 2,000 for 1st time in months,* NJ.com (Jun. 4, 2020), https://www.nj.com/coronavirus/2020/06/nj-coronavirus-deaths-increase-to-11970-with-162530-total-cases-hospitalizations-fall-below-2000-for-1st-time-in-months.html.

Respondents also have a legitimate interest in ensuring that Petitioner does not flee and in protecting the public. As Judge Vasquez found in *Rafael L.O.* and this Court recently found in *Cristian A.R.*, those very important interests are adequately addressed here by fashioning appropriate conditions of release. *See Cristian A.R.*, 2020 WL 2092616, at *13. Here, Petitioner has never been criminally arrested and has informed the Court that he would reside with his wife and children in Brooklyn, New York if released by the Court. The Court finds that Petitioner can be safely released on reasonable conditions of supervision. Although his ties to the United States are not extensive, the Court is also satisfied that there are reasonable conditions that can ensure the Petitioners' appearance for future immigration proceedings. The specific conditions of release are set forth in the Order accompanying this Memorandum Opinion.

Finally, the Court also finds that Petitioner, who has provided his physician's Statement attesting that he has several underlying conditions that render him vulnerable to complications or death if he were to contract COVID-19, and is currently detained at Bergen County Jail, where he cannot maintain social distance or adequate hygiene, has established the extraordinary circumstances necessary to warrant the remedy of release on bail, and make bail necessary to make the habeas remedy effective. *See Cristian A.R.*, Civ. No. 20-3600, ECF No. 26 at 28 (citing *Landano*, 970 F.2d at 1239).

For these reasons, the Court will grant the Petition to the extent it seeks a preliminary injunction directing Petitioner's immediate release on reasonable conditions. An appropriate Order follows.

Dated: July 8, 2020                       */s Madeline Cox Arleo*_____
                                                  **Hon. Madeline Cox Arleo**
                                                  **UNITED STATES DISTRICT JUDGE**